# AFFIDAVIT IN SUPPORT OF
## APPLICATIONS FOR SEARCH WARRANTS

I, Sara Albert, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent of the Department of Defense, Office of Inspector General, Defense Criminal Investigative Service (DCIS) and have been so employed since September 2012.  Prior to that, I was a Special Agent with the United States Secret Service (USSS) beginning in August 2009, and a Federal Officer in the USSS Uniformed Division beginning in 2005.  I am currently assigned to the DCIS Boston Resident Agency, where I conduct a variety of investigations pertaining to violations of federal criminal laws, including money laundering, public corruption, financial crimes, procurement fraud, technology transfer, and health care fraud.

2.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  Since this affidavit is being submitted for a limited purpose, I have not included every fact that I or other agents have learned during the course of this investigation. Rather, I have set forth only those facts that demonstrate that probable cause exists to support the issuance of the requested search warrants.

3.      The purpose of this affidavit is to set forth facts for the Court to determine whether probable cause exists in support of applications for search warrants pursuant to Rule 41 of the Federal Rules of Criminal Procedure authorizing the search for, and seizure of, evidence of the crimes of wire fraud and money laundering, in violation of Title 18 United States Code

(USC) § 1343, and 18 USC §§ 1956 and 1957 (collectively, the "SUBJECT OFFENSES"), at the

following locations (collectively, the "SUBJECT LOCATIONS"):

        a)      The residence of Amaro Goncalves, located at ███████████ Rye, NH;

        b)      Safe Deposit Box ███ at Cambridge Bank, 20 International Drive, Portsmouth, NH;

        c)      Office/Workspace Assigned to Amaro Goncalves, at Sig Sauer, Inc., 72 Pease Blvd, Newington, NH, including Mr. Goncalves's office/workspace, any electronic devices in that space, and any information locally stored on those devices; and

        d)      The person of Amaro Goncalves.

4.      With respect to the wire fraud violations, 18 USC § 1343 states that whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, is guilty of a crime. Moreover, 18 USC § 1346 states that the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services. 18 USC § 1957 makes it a crime to knowingly engage in a monetary transaction in criminally derived property of a value greater than $10,000 that is derived from specified unlawful activity.

5.      Amaro GONCALVES ("GONCALVES") is the Executive Vice President, Global Defense Sales (GDS) for Sig Sauer, Inc. GONCALVES currently resides at ███████████ Rye, NH. Sig Sauer, Inc., is a firearms and accessories manufacturer headquartered at 72 Pease

Blvd, Newington, NH. It is a foreign profit corporation registered in Delaware and a wholly owned subsidiary of Sig Sauer, US Holding LP, headquartered at 18 Industrial Drive, Exeter, NH. Corporation documents for 2019 for Sig Sauer, Inc. list the following individuals as Directors or Officers:

* Ron Cohen - President/Director
* Steven Shawver - Secretary
* Stanley Baumgartner - Treasurer
* Wolfgang Boertz – Director
* Thorsten Fischer - Director

6. Sig Sauer, US Holding LP is a foreign limited partnership company registered in Delaware and is 99.95% owned by L&O Finance GmbH, based in Germany. According to interviews and open source information, L&O is owned by two German citizens, Michael Lueke and Thomas Ortmeier.

7. DCIS, Department of Commerce, Office of Export Enforcement (DOC-OEE), and Homeland Security Investigations (HSI) are currently investigating GONCALVES and other individuals in the United States, Indonesia, Singapore and elsewhere who are believed to employ a network (the "network") of shell companies to facilitate the sale of Sig Sauer firearms and accessories to the Indonesian police, military, and intelligence services. This network appears to be the infrastructure of a scheme to defraud Indonesian governmental entities and/or Sig Sauer, Inc. by alleging that the manufacturing processes, testing, and standards for the weapons being sold by Sig Sauer are enhanced, providing a basis for the network to charge a higher price to the end user than what is ordinarily charged in commercial markets. The official agent for Sig Sauer

in Indonesia is a company in Singapore called ███████████████ The network employs at least eight other companies in Singapore and Indonesia as agents, freight forwarders, and financiers of transactions from Sig Sauer to Indonesia.

8.   I have reviewed purchase orders and price lists that show that companies in the network appear to inflate prices for Sig Sauer products by 450 to 600 percent.  As an example, purchase orders from ███████ to Sig Sauer dated June 13, 2016; January 12, 2017; July 17, 2017; and September 14, 2017, show that Sig Sauer sold its ████████ handgun to ████████ for between $███ and $███ per weapon, but ████████ price for that same weapon to the Indonesian government was $1650 per weapon.  Sales staff at Sig Sauer, including GONCALVES, were recipients of an e-mail on August 01, 2016 with these documents attached.  A former employee at Sig Sauer with direct knowledge of sales practices there told me that GONCALVES maintained control over all pricing decisions in transactions that he/she was a part of.

9.   The Automated Export System is a database maintained by US Customs and Border Protection which contains data for exports of goods from the United States.  A review of this system reveals that between January 1, 2016 and December 31, 2017 Sig Sauer reported 41 shipments from the United States to Indonesia.  The total value of these shipments was $26,929,590.

10.   As shown in more detail below, financial records I have reviewed show that during the time that GONCALVES has been employed as the Executive Vice President, GDS, for Sig Sauer, he has received kickbacks from the network in Singapore and Indonesia via a circuitous route of payments.  The network sends funds from various accounts in Singapore and Indonesia to a business bank account (the "business account") in the United States held by a

foreign company owned by a foreign relative of GONCALVES who is not involved in the arms trade. After the funds are received in the business account, they are transferred to a personal account held in the United States by the same foreign relative (the "personal account"). Ultimately, GONCALVES deposits checks from the foreign relative's personal account into accounts in his name, or uses the funds to pay for products and services for GONCALVES and members of his household.

11.     In December 2018, an Indonesian citizen known as one of the principal agents of this network arrived at Los Angeles International Airport from Singapore. US Customs and Border Protection and HSI conducted a border search of his possessions. As part of the search, a mobile phone was examined. HSI provided me with the results of this search. The phone contained data from the encrypted peer-to-peer messaging application "WhatsApp." Contained in this data was a text conversation between this Indonesian individual and GONCALVES. I believe that the messages were in fact with GONCALVES because AT&T confirmed that the phone number to which the messages were sent, 603-████ is registered to GONCALVES' iPhone. This account is paid for by Sig Sauer and has been active since February 10, 2016. Further, documents provided by Comcast in August 2019 associated GONCALVES with the same telephone number at ████████ Rye, NH.

12.     The device now used by GONCALVES is an Apple brand device, specifically an iPhone XS mobile handset, serial number G0NXXGQEKPV issued telephone number 603-████ (the "SUBJECT DEVICE"). Apple, Inc. provided information to the government pursuant to a search warrant which shows that such a device has been registered to GONCALVES at ████ ████████ Rye, NH since May 01, 2019 and has 603-████ assigned to it.

5

13.     I know from my training and experience, as well as from information found in publicly available materials including those published by Apple, that some models of Apple devices such as iPhones and iPads offer their users the ability to unlock the device via the use of a fingerprint or thumbprint (collectively, "fingerprint") in lieu of a numeric or alphanumeric passcode or password.  This feature is called Touch ID.

14.     If a user enables Touch ID on a given Apple device, he or she can register up to 5 fingerprints that can be used to unlock that device.  The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) found at the bottom center of the front of the device.  In my training and experience, users of Apple devices that offer Touch ID often enable it because it is considered to be a more convenient way to unlock the device than by entering a numeric or alphanumeric passcode or password, as well as a more secure way to protect the device's contents. This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

15.     In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode or password must be used instead.  These circumstances include: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours <u>and</u> the passcode or password has not been entered in the last 6 days.  Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time.  Touch ID also will not work to unlock the device if (1) the device has been turned off or

6

restarted; (2) the device has received a remote lock command; and (3) five unsuccessful attempts to unlock the device via Touch ID are made.

16.     The passcode or password that would unlock the SUBJECT DEVICE is not known to law enforcement.  Thus, it will likely be necessary to press the finger(s) of the user(s) of the SUBJECT DEVICE to the device's Touch ID sensor in an attempt to unlock the device for the purpose of executing the search authorized by this warrant.  Attempting to unlock the relevant Apple device(s) via Touch ID with the use of the fingerprints of the user(s) is necessary because the government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

17.     The text conversation with GONCALVES contained messages from October 2017, wherein the Indonesian individual sent GONCALVES text for a letter that he asked GONCALVES to place on Sig Sauer letterhead.  GONCALVES responded with an image to the individual showing a letter dated October 31, 2017, and addressed to a General of the Indonesian Police, containing the exact text previously supplied to GONCALVES by the Indonesian individual.  This letter asserted that the weapons that the Indonesian government were purchasing through Sig Sauer were specially manufactured and tested to meet higher standards than civilian weapons manufactured by Sig Sauer, and therefore warranted a higher price than Sig Sauer products available on the open market.  This letter was signed by GONCALVES and bore a New Hampshire Notary Public seal.  The Notary Public named in the seal is an employee of Sig Sauer.  My investigation has not uncovered any indication that Sig Sauer used any special steels, different mechanical processes, or any further testing in producing the firearms in

question. In fact, the build date is so close to the ship date that it is unreasonable to think any special manufacturing and testing actually occurred.

18. The October 31, 2017 letter from GONCALVES to a General of the Indonesian Police has been reviewed by agents from HSI and DOC-OEE. Based on their knowledge and experience, neither agent is aware of a "MIL/POLICE spec" category or requirements in the International Trafficking in Arms Regulations (ITAR) or the Export Administration Regulations (EAR) that would differentiate any firearms or parts from those sold in the commercial market. According to the ITAR and EAR, there is no requirement to increase pricing for obtaining a U.S. Department of State or Department of Commerce export license for any particular end use. Moreover, both agents have reviewed the export licenses granted to Sig Sauer for these shipments. Nowhere in these documents is there a request for, or approval of, any MIL/POLICE SPEC standards and Sig Sauer made no mention that there were any unique qualities in any of the exported commodities. Furthermore, upon review of the Sig Sauer website, agents were unable to find any reference to such unique qualities in their products.

19. As part of this investigation, a grand jury subpoena was issued to Sig Sauer for records pertaining to any exports to Indonesia. The October 31, 2017, ████████████ ██████████████████ suggesting that a copy of the letter is not among Sig's official business records.

20. On April 24, 2017, a sales order (#1502498) was created between ███████ and Sig Sauer, which included the purchase of ████ Sig Sauer model ██████████ handguns at a cost of $████ per weapon. On November 9, 2017, two pro forma invoices were created, both listing order #1502498. One invoice listed ██████ Sig Sauer ████████ handguns at a cost of $████ per

8

weapon, $875,500 USD in total. Including other products on the invoice, the total due including export fees, shipping, and insurance was $1,153,627.25 USD, of which $922,901.80 USD (80%) was due upon shipment notification. The second invoice had a total due of $3,127,495.98 USD with $2,501,996.78 due upon shipment notification.  These invoices were located in records obtained from Sig Sauer, and from the freight forwarder used in this export.  The line items on these two documents reflect that different commodities were exported under each invoice, fulfilling the order referenced above.

21.     On December 7, 2017, shipments containing the items on both of the invoices were exported by a freight forwarder in New York to the Indonesian National Police, Jakarta, Indonesia via air freight.

22.     Also on December 7, 2017, Sig Sauer received a wire transfer in the amount of $922,901.80 USD from ██████████ which is not listed as a party in this transaction, but which my investigation has linked to the individual associated with ██████ through common employees and via interviews with other US companies.  The message accompanying this wire referenced sales order #1502498.  On December 11, 2017, Sig Sauer received a wire transfer in the amount of $2,501,996.78 from ██████ referencing a payment for sales order #1502498. Email conversations reflect that the sales staff at Sig Sauer, including GONCALVES, knew that ██████ is affiliated with ██████.

23.     On December 20, 2017, another affiliated company in Indonesia, ██████ ██████████████ which shares employees with ██████ sent a wire in the amount of $100,000 USD to the foreign company controlled by GONCALVES' foreign relative at a financial institution in Florida.  Subsequently, on December 26, 2017, and January 2, 2018,

9

$63,000 USD and $40,000 USD were respectively transferred from the foreign relative's business account to his personal account at the same financial institution in Florida. ▓▓▓▓ was listed as an intermediate consignee on the export of December 7, 2017.

24.     On December 28, 2017 a wire in the amount of $24,904.73 was sent from the personal account to a college in the United States and was used to pay tuition for one of GONCALVES's children.  Moreover, in the five weeks after January 2, 2018, three checks were issued from the personal account to benefit GONCALVES totaling $52,000 USD.

25.     This business account, ending in 234, was opened on August 9, 2013 and has two authorized signers:  the family member and his/her spouse.  From August of 2013 and continuing through 2019, the business account shows indications that it may be used for the business purposes listed on the application used to open the account, specifically that the company is in the field of importing foodstuffs.  From the time of the first known transaction with the Indonesian network in January 2016, $1,324,679.24 was deposited into this account.  Of this, $667,344, or 50.4% of the funds, came from the Indonesian network.  These funds came in the form of 12 wire transfers, 10 of which were in round numbers ending in either an even thousand or five hundred dollars.  All were for exact dollar amounts.  These payments are detailed below:

| Date | Money Sent From: | Money Sent To: | Amount | Affiliation With Network |
|---|---|---|---|---|
| 1/29/2016 | ▉▉▉▉ ▉▉▉ (Indonesia) | Foreign Business Account | $20,000.00 | - Address is that of ▉ ▉▉▉▉ which according to the owners of Triton 6 is the true owner of ▉ <br> - Visa records for the owner of ▉▉▉▉ show this as his employer <br> - Visa for the spouse of an ▉ and ▉ employee lists ▉ as her employer <br> - Financial records show wires to and from ▉ and ▉ |
| 2/23/2016 | ▉▉ (Singapore) | Foreign Business Account | $45,000.00 | - Principal point of contact of this company claims this company in interviews with USG officials <br> - Direct recipient of Sig Sauer shipments |
| 3/29/2016 | ▉▉ (Singapore) | Foreign Company Account | $29,871.00 | - See above |
| 4/15/2016 | ▉▉▉ ▉▉▉▉ (Singapore) | Foreign Company Account | $35,000.00 | - Singaporean business registration records show that the principal point of contact for ▉ is the director of this company <br> - Website ▉▉▉▉ shares language with ▉ website |
| 6/21/2016 | ▉▉▉ ▉▉ ▉▉ (Indonesia) | Foreign Company Account | $45,000.00 | - Sig Sauer documents show that the company is aware that employees of ▉ share employment with ▉ <br> - Listed on "Blacklist" documentation from Indonesian government (October of 2016) along |

| | | | | |
|---|---|---|---|---|
| | | | | - with ▮▮▮▮ principal point of contact<br>- Sent a donation to a private school in the US at the time when a child of ▮▮▮▮ principal point of contact attended it.<br>- Has sent funds to Sig Sauer and to Essex International for Indonesian government purchases to which a principal agent of the Network was a party.<br>- Always a party to Sig Sauer exports to Indonesia |
| 10/18/2016 | ▮▮▮▮▮▮<br>▮▮▮<br>(Indonesia) | Foreign Business Account | $49,000.00 | - See above |
| 12/16/2016 | ▮▮▮▮▮▮<br>▮▮<br>(Singapore) | Foreign Business Account | $48,973.00 | - Website ▮▮▮▮▮▮ shares language with ▮▮▮▮<br>- Shares an address with ▮▮▮▮ (below)<br>- DOC records show that ▮▮▮▮ has been an intermediary in prior Indonesian defense sales with another US exporter. |
| 1/26/2017 | ▮▮▮▮ | Foreign Business Account | $49,500.00 | - See above |
| 3/1/2017 | ▮▮▮▮▮<br>▮▮<br>(Indonesia) | Foreign Business Account | $49,000.00 | - See above |
| 6/6/2017 | ▮▮▮▮▮<br>▮▮<br>(Indonesia) | Foreign Business Account | $50,000.00 | - See above |
| 8/28/2017 | ▮▮▮▮▮<br>(Singapore) | Foreign Business Account | $100,000.00 | - Sig Sauer has received money from ▮▮▮▮ Inside sales employees at |

| | | | | |
|---|---|---|---|---|
| | | | | - Sig Sauer referred to it as a sister company.<br>- A separate US exporter has informed law enforcement that it is a company used by two known principal points of contact for ▮▮▮▮<br>- Website ▮▮▮▮ shares language with ▮▮▮▮<br>- Has the same nominee director as ▮▮▮▮ ▮▮▮▮ |
| 10/5/2017 | ▮▮▮▮ ▮▮▮▮<br><br>(Singapore) | Foreign Business Account | $46,000.00 | - Sig Sauer has received money from ▮▮▮▮ Inside sales referred to it as a sister company.<br>- Shares an address with ▮▮▮▮ ▮▮▮▮ Singapore)<br>- Website ▮▮▮▮ shares language with ▮▮▮▮<br>- A separate US exporter has informed law enforcement that it is a company used by two known principal points of contact for ▮▮▮▮ |
| 12/20/2017 | ▮▮▮▮ ▮▮▮▮<br><br>(Indonesia) | Foreign Business Account | $100,000.00 | - See Above |

26.    These wire transfers appear to have no legitimate economic or business purpose for the foreign company owned by GONCALVES's relative member.  Moreover if either GONCALVES independently, or his relative, was acting as a party to the arms sales to Indonesia or elsewhere, he would be required to inform the United States government of this activity. Specifically, the ITAR covers the registration and licensing of brokers. In summary, activities to

13

assist or facilitate the sale of USML items to foreign parties, specifically, to foreign end-users and/or foreign consignees, are generally referred to as "brokering activity." According to the ITAR section 129.2(b), "brokering activities" is defined as any action on behalf of another to facilitate the manufacture, export, permanent import, transfer, reexport, or retransfer of a U.S. or foreign defense article or defense service, regardless of its origin. Such action includes, but is not limited to:

> (i)  Financing, insuring, transporting, or freight forwarding defense articles and defense services; or
> (ii) Soliciting, promoting, negotiating, contracting for, arranging, or otherwise assisting in the purchase, sale, transfer, loan, or lease of a defense article or defense service.

27.     Persons or companies that are involved in brokering activities are subject to numerous requirements, to include registering as a broker with the Directorate of Defense Trade Controls. In addition, such parties are also required, per Part 129 of the ITAR, to file annual broker reports and report the payments of fees or commissions associated with the sale of defense articles. Moreover, if either GONCALVES independently, or his relative, was involved in brokering activities, to include arms sales to Indonesia, he would be required under Part 129 of the ITAR to register as a broker, and his name would appear on the export licenses and applications.  A check of all of these records reflects that neither GONCALVES nor his foreign relative is identified as a party to the sales in question.

28.     On December 17, 2014, HSI & OEE Special Agents gave a Project Shield America (PSA) outreach presentation to over a dozen Sig Sauer Inc. staff.  GONCALVES was in attendance. A PowerPoint presentation was given, which included advisement of U.S. export control laws and regulations, to include the ITAR and EAR, as well as the licensing requirements

of the US Department of State, DOC, and Office of Foreign Assets Control. Prior to the presentation, PSA outreach instructions and promotional materials, as well as DOC export literature, were provided to the attending audience. One of the topics discussed in the PowerPoint presentation, was brokering activities and the definition of a broker, as defined in the ITAR.

29.     At the time of the first wire from the network to the business account in January 2016, the balance in the business account 234 was $68,749.21.  Since that time, $476,679.24 has been transferred out of the account to a child of the foreign relative, or to entities that appear to be in the same line of business as the foreign relative.  In addition, $848,000 was transferred from the business account to the personal account ending in 344, which is held in the name of the foreign relative at the same U.S. bank.  These transfers were as follows:

| Date | Amount Transferred: |
|---|---|
| 01/31/17 | $30,000.00 |
| 08/08/17 | $80,000.00 |
| 10/02/17 | $50,000.00 |
| 10/25/17 | $28,000.00 |
| 12/26/17 | $63,000.00 |
| 01/02/18 | $40,000.00 |
| 01/23/18 | $38,000.00 |
| 04/26/18 | $66,000.00 |
| 05/10/18 | $28,000.00 |
| 06/08/18 | $56,000.00 |
| 06/22/18 | $43,000.00 |
| 07/31/18 | $63,000.00 |
| 09/06/18 | $10,000.00 |
| 11/20/18 | $72,000.00 |

15

| 12/26/18 | $40,000.00 |
| 01/22/19 | $53,000.00 |
| 03/01/19 | $48,000.00 |
| 03/26/19 | $40,000.00 |

30.     An agent who is familiar with tracing of funds reviewed these transactions and applied the "Lowest Intermediate Balance Rule" (LIBR) to the transfers.  LIBR is a commonly accepted accounting test wherein an account containing criminally derived funds commingled with non-criminally derived funds is analyzed to determine if the source of the transaction is legitimate.  In such a test, the assumption is made that non-criminally derived funds are withdrawn first, and that all transactions whose source is unknown are treated as legitimate.  Applying such rules to the business account in question reveals that of the funds transferred to the personal account described above and ending in 344, at least $321,000 is proceeds of the fraud described above.  Moreover, this analysis identifies which particular funds transfers are traceable to criminal activity upon their transfer from the business account to the personal account.

31.     At the time of the first funds transfer from the business account to the personal account in January 2017, the balance in that account was $208,870.76.  Since that time, $1,051,693.77 was spent from this account.  Of that amount, $899,542.40, or 85.5% of the expenditures, were directed to the use of GONCALVES or his immediate family members.

32.     Further analysis of this account using the LIBR identified that on August 10, 2017, a wire transfer from personal account ending in 344 exhausted the non-criminally derived funds in the account.  Continuing the analysis, between August 10, 2017 and July 31, 2018 no

non-criminally derived funds, as determined by the LIBR test on the business and personal accounts, were available in the personal account. In that window, $267,119.73 was spent from the personal account for the direct benefit of GONCALVES or his immediate family.

33.     Information about bank accounts owned by GONCALVES show numerous financial transactions wherein funds from the foreign relative's personal account held at the Florida financial institution were used to benefit GONCALVES and members of his household. These accounts include, but are not limited to, college tuition payments for GONCALVES' children, Capital One credit card accounts in GONCALVES and family member names, and an account for a Home Equity Line of Credit (HELOC) for GONCALVES' primary residence at ▮ ▮ Rye, NH. The expenditures in question from the personal account to benefit GONCALVES are listed below:

| Date | Money Transferred To: | Amount |
|---|---|---|
| 12/27/2016 | Wire to ▮ for Child 1 | $32,000.00 |
| 1/24/2017 | Great Lakes ACCT 0201 for Child 2 Check 104 | $28,596.77 |
| 1/30/2017 | Capital One Acct 4701 (held by a family member of GONCALVES) Check 105 | $26,510.00 |
| 3/13/2017 | Capital One Acct 4701 (held by a family member of GONCALVES) Check 108 | $26,986.76 |
| 3/22/2017 | Service Credit Union for Child 2 Car Payoff | $21,827.40 |
| 6/8/2017 | Capital One Acct 4701 (held by a family member of GONCALVES) Check 111 | $29,450.00 |
| 7/12/2017 | Wire to ▮ for Child 1 | $24,850.00 |
| 8/10/2017 | Capital One Acct 4701 (held by a family member of GONCALVES) Check 112 | $28,000.00 |
| 8/14/2017 | Child 1 for ▮ Check 114 | $18,000.00 |

Type text here

| 10/2/2017 | Amaro Goncalves "Loan Pay" Check 115 | $38,000.00 |
|---|---|---|
| 10/12/2017 | Capital One Acct 9705 (held by GONCALVES) Check 116 | $11,100.00 |
| 10/27/2017 | Capital One Acct 4701 (held by a family member of GONCALVES) Check 117 | $10,070.00 |
| 11/17/2017 | Capital One Acct 9705 (held by GONCALVES) Check 118 | $12,425.00 |
| 11/18/2017 | Northeast Credit Union "Loan Pay" Check 119 | $12,400.00 |
| 12/11/2017 | Capital One Acct 1683 (held by GONCALVES) Check 120 | $17,100.00 |
| 12/28/2017 | Wire to ██████████ for Child 1 | $24,904.73 |
| 1/8/2018 | Amaro Goncalves – Check 121 | $16,000.00 |
| 1/8/2018 | Capital One Acct 1683 (held by GONCALVES) Check 122 | $22,000.00 |
| 2/5/2018 | Capital One Acct 1683 (held by GONCALVES) Check 123 | $14,000.00 |
| 4/16/2018 | Capital One Acct 1683 (held by GONCALVES) Check 124 | $21,935.00 |
| 5/10/2018 | Bar Harbor Bank & Trust – HELOC – Check 125 | $49,965.00 |
| 5/14/2018 | Child 1 "Room + Board ██████" Check 126 | $18,000.00 |
| 6/7/2018 | Capital One Acct 1683 (held by GONCALVES) Check 127 | $27,900.00 |
| 6/21/2018 | Capital One Acct 1683 (held by GONCALVES) Check 128 | $20,600.00 |
| 7/6/2018 | Wire to ██████████ for Child 1 | $25,700.00 |
| 7/30/2018 | Capital One Acct 1683 (held by GONCALVES) Check 129 | $28,949.99 |
| 8/1/2018 | Bar Harbor Bank & Trust – HELOC | $30,000.00 |
| 9/14/2018 | Bar Harbor Bank & Trust – HELOC | $24,600.00 |
| 11/21/2018 | Wire to ██████████ for Child 1 | $25,500.00 |
| 11/26/2018 | Capital One Acct 1862 (held by GONCALVES) Check 132 | $22,600.00 |
| 12/24/2018 | Capital One Acct 1862 (held by GONCALVES) Check 133 | $29,100.00 |
| 1/15/2019 | Bar Harbor Bank & Trust – HELOC – Check 137 | $31,675.00 |
| 2/4/2019 | Bar Harbor Bank & Trust – HELOC – Check 138 | $36,051.75 |

| 3/11/2019 | Capital One Acct 1862 (held by GONCALVES) Check 139 | $29,000.00 |
| 4/5/2019 | Capital One Acct 1862 (held by GONCALVES) Check 140 | $28,700.00 |
| 5/6/2019 | Capital One Acct 1862 (held by GONCALVES) Check 141 | $26,045.00 |
| 5/25/2019 | Capital One Acct 1683 (held by GONCALVES)  Check 145 | $9,000.00 |
| | **TOTAL** | **$899,542.40** |

34.     In particular, on October 04, 2017, check number 115 from the personal account in the name of GONCALVES's family member, made out to GONCALVES and written in the amount of $38,000, was deposited at the Northeast Credit Union branch located at 100 Borthwick Ave, Portsmouth, NH.  The check was endorsed by GONCALVES and settled to Northeast Credit Union account ending 6285, which is a checking account in GONCALVES's name.

35.     This application of the LIBR also demonstrates that the wire and two checks written subsequent to the receipt of the wire from Indonesia on December 20, 2017 (as outlined in paragraphs 18 and 19 above) involved proceeds of the network's wire transfers.

36.     Furthermore, checks from personal account ending in 334 appear to be written by GONCALVES. This conclusion is not scientific and was reached by comparing checks from the foreign relative's account to other available documents with GONCALVES's handwriting, including checks signed by GONCALVES from his own HELOC account, and other checks.

37.     I have reviewed copies of GONCALVES's United States tax returns for the years for 2015, 2016, 2017, and 2018 and there is no indication that GONCALVES claimed any of these funds as income.  I have also reviewed applications for a mortgage and a home equity line

of credit, both completed on November 27, 2017 and in neither application did GONCALVES list any of these funds as income.   As noted above, $667,344 of funds from the network were deposited into GONCALVES' foreign relative's business account.   The funds ultimately received by GONCALVES totaled $899,542.40.  Other funds were transferred into the business and personal accounts at the Florida financial institution that come from accounts held overseas. Due to the nature of the international banking system, law enforcement cannot ascertain the source of all of these funds.  However, information furnished to investigators pursuant to a grand jury subpoena reflects that one of these accounts, held by the foreign business in a third country, received two wires from ██████ valued at $33,500 and $30,000 on January 1, 2017 and May 8, 2017, respectively.  Between April 19, 2018 and February 26, 2019 wires from this account totaling $551,800 were sent to the business account ending in 324 at the financial institution in Florida.

38.     The foreign relative's US visa application lists his/her income as the equivalent of ████████ per month.  Even at this rate, he/she would have given away half of his/her income for two years in a row, as there is no evidence showing that GONCALVES ever transferred money back to his foreign relative.  The absence of any return payments suggests that the transfers from the personal account to the benefit of GONCALVES are not loans.

39.     Current and former Sig Sauer employees stated to me that their compensation was essentially salary, but with the added benefit of a type of profit sharing program.  Tax documents show that Sig Sauer paid GONCALVES ████████ in 2016; ████████ in 2017; and ████████ in 2018.  According to Sig Sauer's financial statements from these years, their net sales increased in all three years.  Furthermore, tax and mortgage documents indicate that GONCALVES has

benefitted from participation in a "phantom stock" plan at Sig Sauer, which is a type of deferred compensation plan.

40.     According to a former high-level employee of Sig Sauer, the company has an employee handbook.  In that handbook employees are informed that any outside employment that has an effect on the business activities of Sig Sauer must be approved by senior management at the company.  The former employee, who worked at Sig Sauer during the time of many exports to Indonesia, had no knowledge of any arrangement GONCALVES may have had to act outside of his employment.  This employee also told me that GONCALVES had a Sig Sauer issued laptop and that he could work from locations other than 72 Pease Boulevard using this laptop.

41.     Based on my training and experience, the experience of other law enforcement officials, and this investigation, I know that people often maintain copies of business records, travel records, correspondence, and financial records for extended periods of time so as to keep proof of, among other things, ownership of accounts and other assets, satisfaction of loans, and contractual agreements.  In light of this, I believe that GONCALVES has retained records relating to his activities.

42.     Also based on my training and experience and this investigation, I know that people keep their valuables in places they deem secure.  This is particularly true where the items are instrumentalities or evidence of crimes – items they wish to conceal from discovery, such as business records, travel records, correspondence, and financial records.  A residence, an assigned business office, a safe deposit box, or a personal vehicle are places that people often deem secure.  They are places which they can control access to, as well as places that they return to frequently, so they are more likely to notice if someone has accessed the area or if something is

missing. Thus I believe that GONCALVES will have maintained such evidence and instrumentalities, described in Attachment B, of the SUBJECT OFFENSES in the SUBJECT LOCATIONS, as described in Attachment A.

43.     I also know from this investigation that GONCALVES uses electronic devices to communicate with other individuals who have played roles in his commission of the SUBJECT OFFENSES. This investigation has also revealed that GONCALVES used an e-mail account provided by Comcast, Inc. to communicate with financial institutions to advance his application for the Home Equity Line of Credit (HELOC) used in the SUBJECT OFFENSES. This email address is also linked to his iCloud account and utilized on his iPhone which is paid for by Sig Sauer.

44.     Rockingham County, and Town of Rye, New Hampshire land records, reflect that the residence at ▮▮▮▮▮▮▮▮ is owned by "▮▮▮▮▮▮▮▮▮▮▮" GONCALVES is a trustee named in this trust. According to documents I have reviewed as part of this investigation, this house was constructed in 2015, having been inspected most recently in August of 2015. Bank statements that I have reviewed indicate that GONCALVES began to use this address in May 2015.

45.     According to the New Hampshire Bureau of Motor Vehicles, since July 2019 a white Mercedes Benz GLE350, New Hampshire Registration 360 8406, Vehicle Identification Number ▮▮▮▮▮▮▮▮ has been registered to GONCALVES at the ▮▮▮▮▮▮▮ residence. Banking records from Northeast Credit Union appear that prior to July 2019, GONCALVES was receiving a stipend from Sig Sauer that he was using to pay for a loan on his personal vehicle. Agents on surveillance observed a vehicle matching this description coming and going from the house throughout August and September of 2019.

46.     Furthermore, records obtained from Bar Harbor Bank & Trust, which holds the HELOC and mortgage for which █████████████ Rye, NH is collateral, are mailed to that address in the name of GONCALVES. The application to Bar Harbor Bank & Trust for the mortgage on the █████████████address in 2017 includes a real estate appraisal report.  I have reviewed this report and it shows that the █████████████address contains a home office. Photographs show that this office contains a computer.

47.     Cambridge Trust (formerly Optima Bank & Trust Company) has maintained a checking and savings account for GONCALVES since at least January 2015, and the bank currently lists the █████████████location as his address.  The Capital One accounts which receive the checks from the foreign relative's account in Florida belong to GONCALVES at ███ █████████████ Rye, NH. Comcast, Inc. has also provided information to law enforcement which indicates that GONCALVES has maintained an account with them since May 27, 2015, at the ███ █████████████address.  This account is for "High Speed Internet Service" and lists one of the phone numbers associated with the account as the number for his mobile phone provided to him by Sig Sauer.

48.     Records from Cambridge Trust also indicate that GONCALVES maintains Safe Deposit Box ████located at the Cambridge Trust Bank, Pease Branch (formerly Optima Bank and Trust), 20 International Drive, First Floor, Portsmouth, NH 03801.  The box was originally leased on November 9, 2015, and is subscribed to by GONCALVES and his spouse. GONCALVES accessed this box 30 times between November 9, 2015, and when the records indicate it was last accessed, July 9, 2019.  In the same time period it was accessed by his spouse, Shelly Goncalves, four times, most recently on August 6, 2018.

49. Sig Sauer has been located at 72 Pease Boulevard since 2013. GONCALVES has been employed at Sig Sauer as the Executive Vice President, Global Defense Sales since at least May of 2016. However, records I have reviewed indicate that GONCALVES used 310 Locke Road in Rye, NH as his address prior to moving to ████████████. 310 Locke Road is owned by a company affiliated with Sig Sauer, and prior employees have told law enforcement that this house is used as temporary housing for senior employees, indicating that he has been such an employee since at least early 2015.

50. The fraud scheme described above is dependent on GONCALVES's employment at Sig Sauer. He has used his position in order to further the fraud in that he would not have contact with foreign co-conspirators, the cachet of his position, nor any products to sell to them without his position at Sig Sauer. Also as mentioned above, he has used letterhead from Sig Sauer and has had a notary public at Sig Sauer verify his signature on documents used in furtherance of the fraud. I have spoken with a former employee of Sig Sauer who had access to the office spaces at 72 Pease Boulevard, Newington, NH until the middle of 2017. This employee stated that GONCALVES occupied a corner office on the second floor of the building that overlooked the front lawn of Sig Sauer, and he/she had been in this office regularly. This office was marked with GONCALVES's name. This employee further stated that offices at Sig Sauer did not change frequently.

51. The Mercedes Benz GLE350 described above has been seen parked in the parking lot of Sig Sauer at 72 Pease Blvd, Newington, NH on numerous occasions in September of 2019. Agents have also seen GONCALVES at this location. GONCALVES was witnessed sitting in this vehicle for over 30 minutes, between 5:40 AM and 6:15 AM, and carrying a bag as he exited this vehicle and entered 72 Pease Boulevard, Newington, NH. As GONCALVES is the

24

Executive Vice President for Global Defense Sales, I believe that he may have to make phone calls, or participate in video conferences, with business contacts in time zones throughout the world necessitating communication at non-traditional working hours, such as early in the morning.

52.     As the Executive Vice President, GDS, GONCALVES travels frequently. A check of Department of Homeland Security (DHS) records reflects that between January 1, 2019, and September 6, 2019, GONCALVES has crossed into or out of the United States on 22 occasions. These records indicate that these trips were likely business travel because his Sig Sauer email account and telephone number are linked to his travel reservations.

53.     Particularly, on August 18, 2019, while travelling on his U.S. passport, GONCALVES departed Boston Logan International airport on a Qatar Airlines flight and arrived on August 19, 2019, at Hamad International Airport in Doha, Qatar. Thereupon, he was ticketed to depart on a connecting Qatar Airlines flight to Bangkok, Thailand, and arrived on said day. GONCALVES was then ticketed to depart Bangkok, Thailand, on August 22, 2019, on a Thai Airways flight and arrive in Jakarta, Indonesia. On August 23, 2019, while travelling on his U.S. passport, GONCALVES departed Soekarno-Hatta International airport in Jakarta, Indonesia, on a Cathay Pacific flight and arrived on August 24, 2019, in Hong Kong. Thereupon, he was ticketed to depart on connecting Cathay Pacific Airlines flight to Boston, Massachusetts. Additionally, comparing travel records obtained from DHS to GONCALVES' "safe deposit admission record" at Cambridge Trust, I have determined that between February 25, 2019, and July 9, 2019, GONCALVES accessed his safe deposit box six times, each within six days of international travel.

54.     In conclusion, probable cause exists to believe that between January 2016 and May 2019, in the District of New Hampshire and elsewhere, GONCALVES committed the offenses of wire fraud in violation of 18 USC § 1343 and 1346 and money laundering in violation of 18 USC §§ 1956 and 1957.  Furthermore, as described above, there is probable cause to believe that evidence and instrumentalities of the SUBJECT OFFENSES, which are described as ITEMS TO BE SEIZED in Attachments B, will be found in the SUBJECT LOCATIONS, as described in Attachments A.


/s/ Sara Albert
Sara Albert
Special Agent
Department of Defense, OIG
Defense Criminal Investigative Service


Subscribed and sworn to before me on September 23, 2019


/s/ Andrea K. Johnstone
Hon. Andrea K. Johnstone
UNITED STATES MAGISTRATE JUDGE

ATTACHMENT A4

Person to be searched

The person of Amaro GONCALVES, born ███████████, a resident of ██████████ █████ Rye, NH and the Executive Vice President of Sig Sauer, Inc.

ATTACHMENT B4

Property to be seized

All records relating to violations of Wire Fraud, 18 U.S.C. § 1343, and Money Laundering, 18 U.S.C. § 1957 and § 1956, those violations involving Amaro GONCALVES and his accomplices and co-conspirators, including:

    a.  Apple brand device, specifically an iPhone XS mobile handset, serial number G0NXXGQEKPV issued telephone number 603-█████;

    b.  Storage media;

    c.  Notebooks;

    d.  Credit and debit cards;

    e.  Records, communications, receipts, business cards, and information relating to a scheme to obtain kickbacks from entities in Indonesia and Singapore for Sig Sauer arms sales to Indonesia.

For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

1.    Evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

2.    evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

3.    Evidence of the lack of such malicious software;

4.      Evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

5.      Evidence indicating the computer user's state of mind as it relates to the crime under investigation;

6.      Evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

7.      Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

8.      Evidence of the times the COMPUTER was used;

9.      Passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

10.     Documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

11.     Records of or information about Internet Protocol addresses used by the COMPUTER;

12.     records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

13.     Contextual information necessary to understand the evidence described in this attachment.

14.     Routers, modems, and network equipment used to connect computers to the Internet.


During the execution of the search of the person of Amaro GONCALVES described in Attachment A, law enforcement personnel are authorized to press the fingers (including thumbs) of Amaro GONCALVES to the Touch ID sensor of any Apple brand device(s), such as a Smart Phone, found on the person of Amaro GONCALVES, for the purpose of attempting to unlock the device via Touch ID in order to search the contents as authorized by this warrant.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.